**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA

    v.

AKIL DORSEY

No. 07-cr-0404-ABA[1]

**MEMORANDUM OPINION**

In 2009, Akil Asim Dorsey, Sr., pleaded guilty to being a felon in possession of a firearm. The sentencing court concluded that because of Mr. Dorsey's prior convictions, under the law at that time the statutory minimum sentence was 15 years, and sentenced him to 25 years in prison and 5 years of supervised release. Mr. Dorsey has filed a motion under 28 U.S.C. § 2255 for a ruling that based on intervening Supreme Court caselaw, his prior convictions at the time of sentencing did not trigger the 15-year minimum, and instead a 10-year maximum. His current § 2255 motion turns on whether a conviction from 1999 under Virginia Code § 18.2-248 qualifies as a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A). That Virginia statute, in pertinent part, prohibited distribution of cocaine. But the definition of cocaine under Virginia law was different—and, as will be explained below, broader—than under federal law. For the following reasons, the Court concludes that it has jurisdiction over Mr. Dorsey's motion, and that his 1999 conviction for the distribution of cocaine under Virginia Code § 18.2-248 is not, under current law, a serious drug offense. His motion is granted, and his sentence will be reduced to time served.

---

[1] The civil case number for Dorsey's petition is 16-cv-1673-ABA.

## I. BACKGROUND

In 2008, Dorsey pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). At sentencing, the sentencing court concluded that Dorsey was an armed career criminal under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). ECF No. 31 (Tr. of Sentencing Proceedings, Feb. 2, 2009) at 34:10–22.[2] The Court found that Dorsey had five prior convictions that supported an ACCA sentencing enhancement. Four qualified (at that time) as "violent felonies" under 18 U.S.C. § 924(e)(2)(B): Virginia unlawful wounding, Virginia robbery, Virginia attempted robbery, and Maryland robbery with a dangerous weapon. And one—the one at issue here—qualified as a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A): Virginia distribution of cocaine. The sentencing judge (Judge Messitte) sentenced Dorsey to twenty-five years of imprisonment (300 months) and five years of supervised release. ECF No. 23. Dorsey appealed; the Fourth Circuit affirmed the judgment. ECF No. 34-1.

In 2011, Dorsey moved to vacate his sentence under § 2255, the statute that allows a federal prisoner to challenge the validity of his sentence. ECF No. 36. Judge Messitte denied his motion in July 2013. ECF No. 54.

In May 2016, Dorsey sought the Fourth Circuit's authorization for him to file a second or successive § 2255 motion on the ground that *Johnson v. United States*, 576 U.S. 591 (2015), announced a new rule of constitutional law. On that ground, the Fourth Circuit concluded that Dorsey had "made a prima facie showing that the new rule of constitutional law announced in *Johnson* . . . and held to apply retroactively to cases on

---

[2] All references to ECF numbers are for Case No. 07-cr-0404. And all references to page numbers are to ECF pagination, which may not correspond with original page numbers.

collateral review by *Welch v. United States*, [578 U.S. 120] (2016), may apply to his case" and thus "grant[ed] authorization for Dorsey to file a second or successive § 2255 motion, thus permitting the district court to consider the motion in the first instance." ECF No. 60.

Dorsey timely filed his second § 2255 motion in May 2016. ECF No. 61. The government filed a motion to stay, which was granted. ECF Nos. 62 & 63. In February 2023, Dorsey filed a *pro se* motion for compassionate release and/or sentence reduction, and requested appointment of counsel. ECF No. 66. The Office of the Federal Public Defender began representing Dorsey in connection with his § 2255 motion and in February 2023 filed a motion to supplement the § 2255 motion. ECF No. 68. In that filing, Dorsey (now through counsel) argued that his two prior convictions for Virginia robbery no longer qualify as ACCA "violent felonies" and his 1999 conviction for distribution of cocaine "categorically fails to qualify as a 'serious drug offense' under the ACCA after the Fourth Circuit's decision in *United States v. Hope*, 28 F.4th 487, 496–97 (4th Cir. 2022) because at the time of the prior conviction, Virginia defined cocaine more broadly than does the current federal Controlled Substances Act that controls the ACCA 'serious drug offense' definition." ECF No. 68-1 at 1–2.

Judge Messitte ordered the government to respond, which it did. ECF Nos. 70 & 74. The government conceded that two of Dorsey's convictions no longer counted as ACCA predicates: Virginia robbery and Virginia attempted robbery. ECF No. 74 at 2 (conceding this "in light of *United States v. White*, 24 F.4th 378 (4th Cir. 2022)"). But the government contended (as it continues to contend) that the 1999 cocaine distribution conviction remained an ACCA "serious drug offense." *Id.* at 7–9. In response, Dorsey filed a motion to further amend his § 2255 motion, including to

3

contend that "[c]ocaine, as defined under current federal law, excludes ioflupane." ECF No. 75-1 at 4. Because ioflupane was removed from the federal Schedule II in September 2015, and because distribution of ioflupane would have violated Va. Code § 18.2-248 at the time of Dorsey's conviction, he argued there was a categorical mismatch between the federal and Virginia definitions of cocaine. *Id.* at 4–7. The government then requested that Dorsey's motion be held in abeyance pending a decision by the U.S. Supreme Court in *Jackson v. United States*, No. 22-6640. ECF No. 78. (The Supreme Court later granted certiorari in a similar case, *Brown v. United States*, No. 22-6389.) Over Dorsey's objection, *see* ECF No. 79, Judge Messitte granted the motion, ordering that the § 2255 motion would be held in abeyance pending a decision in that case. ECF No. 82. And in January 2024, Judge Messitte denied Dorsey's motion for compassionate release. ECF Nos. 84 & 85.

In May 2024, the Supreme Court issued *Brown v. United States*, 602 U.S. 101 (2024), instructing lower courts how to interpret "controlled substance" under the ACCA. It held that "a prior state drug conviction constitutes an ACCA predicate if the drugs on the federal and state schedules matched *when the state drug offense was committed.*" *Id.* at 119 (emphasis added). That is, to know if a drug is a "controlled substance," courts must look at how the drug was defined at the time of the crime, as opposed to the time of the conviction or the sentencing or some other time. *Brown* held that when a court evaluates whether a prior drug offense is a "serious drug offense" under the ACCA, the court must ask: Did the "offense me[e]t ACCA's definition of seriousness—and thus suggest[] future danger—at the time it was committed"? *Id.* at 114.

Following *Brown*, both parties here filed supplemental briefs on the question of whether the 1999 conviction qualifies as a serious drug offense under the ACCA. ECF No. 86 (defense brief); ECF No. 87 (government brief). Dorsey withdrew his argument about ioflupane. ECF No. 86 at 2 n.2 ("In light of *Brown*, Mr. Dorsey withdraws his argument in ECF No. 75 asserting that his prior Virginia cocaine offense does not qualify as an ACCA 'serious drug offense' on the ground that Virginia's cocaine definition criminalized ioflupane at the time of his prior conviction but current federal law does not."). But his other argument remained, that his 1999 conviction for cocaine distribution does not categorically qualify as a serious drug offense under the ACCA.

That argument is premised on a difference in how federal law and Virginia law in 1999 defined what qualifies as cocaine: Federal law prohibited, in pertinent part, "cocaine, its salts, optical and geometric isomers, and salts of isomers." 21 U.S.C. § 812, Schedule II(a)(4) (1990). Virginia law prohibited, in pertinent part, "cocaine or any salt or isomer thereof." Va. Code § 54.1-3448.1 (1999), Schedule II. At its core, Dorsey's argument is that (1) the Virginia cocaine definition is indivisible between "cocaine" and "salt[s] or isomer[s]" because these versions are alternative means—not elements—of a single offense," ECF No. 89-1 at 9; *see also* ECF No. 86 at 5–11; (2) because Virginia made it unlawful to distribute any isomer of cocaine while federal law made it unlawful to distribute only "optical and geometric" isomers of cocaine, under the categorical approach the state law is categorically broader than the pertinent federal law, *see, e.g.*, ECF No. 68-1 at 4–8; ECF No. 86 at 14–16; and (3) insofar as the modified categorical approach may be applied, the only available *Shepard* documents "say nothing about whether the guilty plea was to isomer cocaine versus non-isomer cocaine," ECF No. 86 at 10.

The government's principal arguments in response are (1) Dorsey's motion falls outside the Fourth Circuit's May 2016 order authorizing a successive § 2255 motion and thus this Court lacks jurisdiction over it, *see, e.g.*, ECF No. 87 at 4–5; (2) the argument is foreclosed by *Cucalon v. Barr*, 958 F.3d 245, 253 (4th Cir. 2020), *see, e.g.*, ECF No. 74 at 8–9; and (3) on the merits the Virginia statute should be considered divisible and, because Dorsey was indicted for distributing "cocaine," as opposed to a "salt or isomer" of cocaine, under the modified categorical approach the prior conviction qualifies as a "serious drug offense" under the ACCA, *see, e.g.*, *id.* at 7–9.

The case was reassigned to the undersigned in January 2025. The Court granted both sides' motions for leave to file their supplemental filings (which were then docketed at ECF Nos. 92–95) and set a hearing for June 2025. ECF No. 91. Those filings included an expert report by Dr. Michael Hilinski, a professor of chemistry at the University of Virginia. ECF No. 93-1. Dorsey also filed a motion to expand the record to include additional evidence. ECF No. 97. The government filed a motion to postpone the hearing, which Dorsey did not oppose. ECF No. 98.

The government then filed a motion to expand the record to include an expert report of its own, ECF No. 101, to which Dorsey responded, ECF No. 102. The government filed a notice of supplemental authority, ECF No. 105, to which Dorsey responded, ECF No. 106. The Court reset the hearing for September 8, 2025. On September 3, the parties reached out to chambers to jointly request to reschedule the hearing, which was reset for January 14, 2026. In January, the defense requested a postponement due to Dr. Hilinski's unavailability; the Court reset the hearing on the § 2255 motion for June 4, 2026. ECF Nos. 109 & 112. In the meantime, Dorsey filed another motion for compassionate release, which the parties fully briefed. ECF Nos. 107,

6

110, 111, 116, 117. Dorsey also filed an additional motion to expand the record, to include an expert report from a different chemistry expert, ECF No. 113, which is unopposed; and the government requested that its expert testify at the hearing remotely, which the Court granted, ECF Nos. 114 & 115.

The Court held the hearing on June 4, on Dorsey's § 2255 motion and his motion for compassionate release. In addition to argument, both sides presented evidence pertinent (or conditionally pertinent) to the § 2255 motion. The government presented testimony from Dr. Scott Denmark, who is the R.C. Fuson Professor of Chemistry at the University of Illinois at Urbana-Champaign, and is an expert on stereochemistry. *See* ECF No. 101-1 (Dr. Denmark's written report). Stereochemistry is the "study of the three-dimensional behavior of molecules." *Id.* at 2. At the hearing, Dr. Denmark summarized the aspects of his report about general principles of stereochemistry, in particular principles of isomerism. The general hierarchy of isomers, as Dr. Denmark testified, is captured in Figure 1 in his report (*id.* at 3):



At the hearing, he explained, among other things, that the term "isomer" includes all three categories of isomers on that hierarchy: enantiomers (previously known as optical isomers), diastereomers (previously known as geometric isomers) and

7

constitutional isomers (previously known as positional isomers). *See also id.* at 2–5. Dr.

Denmark also testified that the term "stereoisomer," at least in current stereochemistry

parlance, does not refer to all isomers, but rather only enantiomeric (previously known

as optical) and diastereomeric (previously known as geometrical) isomers—*i.e.*, not

constitutional isomers. *See also id.* at 5 ("To reiterate, stereoisomers are defined as

either enantiomers (optical isomers) or diastereomers (geometrical isomers).").

Dr. Denmark then applied those principles to cocaine. He explained that there

are eight *stereoisomers* (i.e., enantiomers and diastereomers) of cocaine, as illustrated

in Figure 7 of his report:



**Figure 7.** Relationship of all stereoisomers of cocaine defined in optical and geometric isomerism terms. (See Figure 1-4 for symbol key).

He described the relative potency of those stereoisomers of cocaine, and testified that

there is a wide range in their potency, some bearing only 1/600th the potency of

naturally occurring (R)-cocaine.

8

Those are the *stereoisomers* of cocaine (i.e., enantiomers and diastereomers). Dr. Denmark also explained that there are various constitutional isomers of cocaine that exist. At the hearing, he described and illustrated several of them (ECF No. 126-2 at 6):

He explained that these constitutional isomers of (R)-cocaine have substantial differences in "chemical (pharmacological) properties." For example, two of the examples above include scopolamine, which he explained can be used for treatment of asthma, and fenoterol, which is an anesthetic. *Id.*[3] But he acknowledged that there are unquestionably constitutional isomers of (R)-cocaine that exist, not just theoretically but in the real world.[4]

---

[3] One of Dorsey's experts explained that scopolamine also is a common treatment for motion sickness. ECF No. 86-1 at 7.

[4] The right-most constitutional isomer illustrated in Dr. Denmark's chart at the hearing (ECF No. 126-2) he labeled as "CocaMan." That is not an isomer that exists; Dr. Denmark was using that as an example of how broad the concept of constitutional isomers is.

The government did not offer Dr. Denmark as a legal expert, but rather an expert on stereochemistry. But based on his expertise, Dr. Denmark also opined that he believes that this Court should construe the Virginia statute's prohibition on "all" isomers of cocaine to not literally mean "all" isomers but rather only stereoisomers, i.e. enantiomeric (previously known as optical) and diastereomeric (previously known as geometrical) isomers of (R)-cocaine. As he put it in his report, Dr. Denmark acknowledged that "[a]s written, this statute could be interpreted as covering all isomers of cocaine, including the most general in the isometric hierarchy, constitutional isomers." ECF No. 101-1 at 7. He considers that interpretation "scientifically and legally absurd" and that instead states, "[i]t is my interpretation that the statute intended to specify stereoisomers (enantiomers (or optical isomers), and diastereomers (or geometrical isomers) so as to comport with the Federal definitions in the preceding text." *Id.* The Court did not admit Dr. Denmark's testimony as relevant to this Court's statutory interpretation of the Virginia statutes, but that articulation also aligns with the legal argument the government has offered here, as discussed below.

On chemistry matters, Dr. Denmark's testimony was detailed and credible; in fact, the defense did not dispute any of Dr. Denmark's scientific testimony.

The defense called Dr. Benjamin Streifel, whose testimony largely concurred with Dr. Denmark's testimony regarding the types of isomers and whether they exist, including that constitutional isomers of (R)-cocaine exist. In fact, Dr. Streifel testified that his only disagreement with Dr. Denmark was on what nomenclature to use, but he agreed with Dr. Denmark on the actual science.

The government also called John Payne, a supervisor in the Virginia Department of Forensic Science, where he has worked since 2005. Mr. Payne testified that their

10

analysis equipment can distinguish between cocaine isomers, but that as a practical matter, he has never seen an isomer detected other than the naturally occurring (R)-cocaine. Instead, he has only seen (R)-cocaine detected and he testified that if the equipment detected a different isomer, he would not call the substance cocaine.

Mr. Payne's testimony was offered at least in part in response to the declaration, filed by the defense, from Shawn Stout, a Senior Assistant Public Defender at the Virginia Indigent Defense Commission. ECF No. 97-1. Mr. Stout stated that he has been a criminal defense attorney for thirteen years and has never seen a case where a court instructed a jury that, in order to convict, it must unanimously find that the controlled substance involved was (R)-cocaine as opposed to another isomer of cocaine (indicating that the relevant statutes were indivisible as to cocaine type).

At the hearing, the presentation of evidence was followed by argument on the § 2255 motion and the motion for compassionate release. The parties also addressed a dispute regarding the specific relief requested in the § 2255 motion: the government contends that if the Court rules that the 1999 conviction did not qualify as an ACCA predicate conviction, the judgment should be amended to "time served," whereas the defense contends that the judgment should be amended to a fixed term of incarceration of 10 years, which would have been Dorsey's maximum sentence if the ACCA did not apply. *See* ECF No. 102 at 19 n.6. Following the hearing, the defense filed a notice of supplemental authority on that issue. ECF No. 123.

## II.  DISCUSSION

As noted, Dorsey argues that his offense for Virginia distribution of cocaine should not count as a "serious drug offense" under the ACCA. Thus, by Dorsey's count, he has only two predicate ACCA offenses—Virginia unlawful wounding and Maryland

11

robbery[5]—so he no longer qualifies for the ACCA enhancement, and thus the statutory maximum term of incarceration for his offense of conviction is 10 years. As discussed below, the Court agrees. But there is also a threshold jurisdictional question, which will be addressed first.

## A. The Court's Jurisdiction Over Dorsey's Second § 2255 Motion

The Court has jurisdiction to hear Dorsey's § 2255 motion. This is true even though, as the government notes, the Fourth Circuit authorized Dorsey's second motion on other grounds. *See* ECF No. 94 at 1, 5 (initially filed at ECF No. 87).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") allows a federal prisoner to move to vacate his sentence, a process known as a collateral attack. *See* 28 U.S.C. § 2255. But AEDPA limits these attacks: after a prisoner's initial § 2255 motion fails, his successive § 2255 motions must meet one of two requirements. *Id.* § 2255(h); *see In re Graham*, 61 F.4th 433, 438 (4th Cir. 2023) (holding that § 2255 incorporates § 2244(b)(3), but not (b)(1) or (2)). The motion must first either contain newly discovered evidence that would suffice to establish innocence or rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h). In addition, a successive § 2255 motion requires first obtaining the appellate court's authorization. *Id.* § 2244(b)(3). The appellate court reviews the motion to determine whether one of the two requirements are met. *See id.* § 2255(h); *id.* § 2244(b)(3); *In re Graham*, 61 F.4th at

---

[5] Dorsey concedes that these two crimes are, under current Fourth Circuit law, violent felonies under the ACCA. ECF No. 86 at 16–17. But he preserves his arguments that the crimes should not qualify as such. *Id.*

437–38. Only then does a sentencing court have jurisdiction to hear a successive motion. *See* 28 U.S.C. § 2255(h).

But what if the appellate court grants review on one ground, but the case then turns on another? That is the case here. The Fourth Circuit certified Dorsey's successive § 2255 motion based on a new rule of constitutional law about certain *violent felonies* as ACCA predicates. *See* ECF No. 60. Now, Dorsey's motion turns on certain *drug offenses* as ACCA predicates. But that distinction does not require Dorsey to go back to the Fourth Circuit for another successive § 2255 certificate for this Court to have jurisdiction over Dorsey's argument premised on the isomer-based mismatch between the federal and Virginia law on what constituted "cocaine" in 1999. To explain why requires some context on the ACCA.

If, at sentencing, a convicted defendant has at least three predicate offenses that qualify as either a "violent felony" or "serious drug offense," the ACCA requires an enhanced sentence. 18 U.S.C. § 924(e) (2022). The ACCA defined *violent felony*, in part, with a residual clause. *Id*. § 924(e)(2)(B)(ii) (". . . or otherwise involves conduct that presents a serious potential risk of physical injury to another."). But in 2015, the Supreme Court held that the residual clause is unconstitutionally vague. *See Johnson*, 576 U.S. at 606. Specifically, *Johnson* held that "imposing an increased sentence under the residual clause of the Armed Career Criminal Act violate[d] the Constitution's guarantee of due process." *Id*. Because of the constitutional hook, this holding announced "a new rule of constitutional law." *See* 28 U.S.C. § 2255(h)(2). And in 2016, the Supreme Court held that the new rule of constitutional law is retroactive. *Welch*, 578 U.S. at 135.

As discussed, to bring a second or successive § 2255 motion, a federal prisoner must show that his motion is based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h)(2). *Johnson* and *Welch* gave certain federal prisoners just that because (1) they were sentenced under the old, unconstitutional residual clause of the definition of "violent felony" and (2) they had already exhausted their single application for a § 2255 motion. Thus, those prisoners had a viable argument for a second § 2255 motion. *See, e.g.*, *United States v. Cornette*, 932 F.3d 204 (4th Cir. 2019).

When an appellate court approves a second § 2255 motion, the proceeding constitutes a "resentencing." *E.g.*, *id.* at 216 (after concluding that one of the defendant's prior convictions was not a "violent felony," "revers[ing] and remand[ing] for resentencing, with instructions for the district court to resentence Cornette without the ACCA enhancement"). Section 2255 itself also requires that "[i]f the court finds that . . . there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall . . . resentence [the prisoner]." 28 U.S.C. § 2255(b). Just as at an original sentencing when the government requests an ACCA sentence, the district court must evaluate (or reevaluate) each of the prior offenses that the government contends trigger an ACCA sentence, then tally whether those convictions qualify the prisoner as an armed career criminal. *See id.* Said differently, courts reevaluate the prisoner's predicate convictions for violent felonies *and* his predicate convictions for serious drug offenses. *See id.*

That is what must happen here. The Fourth Circuit authorized Dorsey's second § 2255 motion because four of his five predicate offenses were violent felonies and thus

14

were called into question by *Johnson*. ECF No. 60 at 1. The Fourth Circuit thus found that Dorsey has a *Johnson* claim. *See id.* (referring to Dorsey's claim as "a *Johnson* claim"). Dorsey's *Johnson* claim allows a collateral attack on Dorsey's entire sentence. Thus this case is now, effectively, a re-sentencing. As part of that resentencing, the Court must reexamine all predicate offenses to determine whether Dorsey qualifies as an armed career criminal. *See Cornette*, 932 F.3d at 215.

**B.  Dorsey's Violent-Felony Predicates**

Reevaluation of Dorsey's four violent-felony predicates, as it turns out, is straightforward. The Fourth Circuit has decided whether after *Johnson* each offense is still an ACCA predicate, and the parties concede as much. *See* ECF No. 86 at 16–17 ("Mr. Dorsey acknowledges that under current Fourth Circuit law, his prior convictions for Virginia unlawful wounding and Maryland robbery with a dangerous weapon constitute 'violent felonies' under the ACCA."); ECF No. 74 at 2 ("The Government concedes that Dorsey's Virginia convictions for robbery (Case CF960068) and attempted robbery (Case CF010083) no longer qualify as 'violent felonies' in light of *United States v. White*, 24 F.4th 378 (4th Cir. 2022).").

Dorsey's four offenses that *previously* qualified as violent felonies are Maryland robbery with a dangerous weapon, Md. Code, Crim. Law § 3-403; Virginia unlawful wounding, Va. Code § 18.2-51; Virginia robbery, *id.* § 18.2-58; and Virginia attempted robbery, *id.* Two of these four—Maryland robbery and Virginia unlawful wounding—are, after *Johnson*, still violent felonies. *See United States v. Johnson*, 945 F.3d 174, 181 (4th Cir. 2019) ("Maryland robbery constitutes a violent felony under the ACCA."); *United States v. Rumley*, 952 F.3d 538, 551 (4th Cir. 2020) (holding that Virginia unlawful wounding constitutes a violent felony under the ACCA). The other two offenses—

Virginia robbery and Virginia attempted robbery—are not. *See United States v. White*, 24 F.4th 378, 382 (4th Cir. 2022) ("We therefore hold that Virginia common law robbery does not qualify as a 'violent felony' under the ACCA's force clause.").

As a result, Dorsey now has *two* predicates that qualify as violent felonies under the ACCA. The ACCA requires at least *three* predicates to enhance a sentence. His final predicate offense—Virginia distribution of cocaine—previously qualified as a "serious drug offense" under the ACCA. If Dorsey is correct that a conviction for Virginia distribution of cocaine is *not* a "serious drug offense" within the meaning of the ACCA, then Dorsey has only two ACCA predicates, and his sentence should have already ended. If, on the other hand, Virginia distribution of cocaine *is* a serious drug offense, then Dorsey still has three predicate offenses and he is not entitled to relief on *Johnson* grounds.

## C.  The ACCA's Definition of a "Serious Drug Offense"

With reconsideration of violent-felony predicates decided, the Court next analyzes any predicates for serious drug offenses. Here, the only such offense is Dorsey's 1999 Virginia conviction for distribution of cocaine. Again, though, context is necessary. So before analyzing whether Dorsey's conviction for cocaine distribution qualifies, the Court discusses the ACCA's scheme for determining whether a prior offense qualifies as an ACCA predicate.

### 1.  *The Categorial and Modified Categorial Approaches*

"The Armed Career Criminal Act (ACCA or Act), 18 U.S.C. § 924(e), increases the sentences of certain federal defendants who have three prior convictions 'for [either] a violent felony'" or a serious drug offense. *Descamps v. United States*, 570 U.S. 254, 257 (2013). "To determine whether a past conviction is for one of those crimes, courts use

16

what has become known as the 'categorical approach': They compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—i.e., the offense as commonly understood. The prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than, those of the generic offense." *Id.* In analyzing a conviction under the categorical approach, courts do not consider "the particular facts underlying those convictions." *Id.* at 261 (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)).

Yet some states' criminal statutes present a wrinkle. When a statute lists "one or more elements of the offense *in the alternative*," *id.*, the statute "define[s] multiple crimes" and the statute is considered "divisible." *Mathis v. United States*, 579 U.S. 500, 505 (2016) (emphasis added); *accord United States v. Redd*, 85 F.4th 153, 162 (4th Cir. 2023) ("A divisible statute sets out 'one or more elements of the offense in the alternative,' effectively listing different crimes.") (quoting *Descamps*, 570 U.S. at 257). In contrast, a statute that lists alternative *means* defines one crime that can be committed in various ways and is considered "indivisible." *Mathis*, 579 U.S. at 504–06.

An indivisible statute requires a sentencing court to apply the aforementioned categorical approach; a divisible statute requires the court to apply the modified categorical approach. *See id.* at 505–06. Thus, in ACCA cases such as this, a court must first decide which approach applies. *United States v. Allred*, 942 F.3d 641, 647 (4th Cir. 2019) ("At the outset, we must determine which of the two modes of analysis the Supreme Court has approved in this context applies to the instant case. Specifically, we must choose between the 'categorical approach' and the 'modified categorical approach.'").

17

Determining whether a statute is indivisible or divisible requires looking at which elements the Government must prove beyond a reasonable doubt to convict. "The '*focal point* of the [divisibility] analysis' is 'what the jury must find (or a defendant must admit) to convict.'" *Redd*, 85 F.4th at 168 (quoting *United States v. Al-Muwwakkil*, 983 F.3d 748, 755 (4th Cir. 2020)). This is because, as stated, a divisible statute "list[s] elements in the alternative, and thereby define[s] multiple crimes," while an indivisible statute defines one crime but provides alternative means of committing the crime, any combination of which a jury could find and still unanimously convict. *Mathis*, 579 U.S. at 504–05; *Descamps*, 570 U.S. at 257–58; *Allred*, 942 F.3d at 648.

If a statute is divisible, the next step is to determine *which* specific crime the defendant was convicted of. *See Cucalon*, 958 F.3d at 253 (applying the modified categorical approach and finding that the defendant was convicted under Virginia Code § 18.2-248 for "distribution of cocaine"). To do so, the court may "consult a limited class of documents, such as indictments and jury instructions, to determine which alternative" crime the defendant was convicted of. *Descamps*, 570 U.S. at 257. This limited class of documents are known as *Shepard* documents.[6] "The court can then do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime." *Id.* Despite considering the movant's *Shepard* documents, the modified

---

[6] *See Shepard v. United States*, 544 U.S. 13, 26 (2005) ("We hold that enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information.").

categorical approach still "retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime." *Id.* at 263.

Whether under the categorical approach or the modified categorical approach, courts must use the definitions of the state drug conviction at the time the movant *committed* the crime—not when he was convicted or sentenced. *Brown*, 602 U.S. at 119 ("[A] prior state drug conviction constitutes an ACCA predicate if the drugs on the federal and state schedules matched when the state drug offense was committed.").

### 2. *Divisibility*

As noted above, the first question in determining whether Dorsey's 1999 conviction qualifies as a "serious drug offense" is to determine "which of the two modes of analysis the Supreme Court has approved in this context applies to the instant case." *Allred*, 942 F.3d 641. That requires deciding whether the Virginia law under which Dorsey was convicted is divisible or indivisible in relevant respect.

At the time of Dorsey's prior conviction, the statute under which he was convicted made it unlawful to, among other things, "distribute . . . a controlled substance." Va. Code § 18.2-248 (1999). The elements of that crime are that "[1] the defendant [2] distributed [3] (name of drug)." *Cucalon*, 958 F.3d at 253 (citing the Virginia's model criminal jury instruction No. 22.240, the instruction for distribution of cocaine with evidence of an accommodation); *see also* Va. Model Jury Inst. Crim. No. 22.200 (Sept. 2024) ("The defendant is charged with the crime of distributing (name of drug), which is a Schedule [I; II] controlled substance. The Commonwealth must prove beyond a reasonable doubt that the defendant distributed (name of drug).").

The reference to "controlled substance" meant that proving that a person distributed a controlled substance in violation of § 18.2-248 required proving that the

19

substance the person distributed was a substance listed on the pertinent schedule. Here, the pertinent schedule was Virginia's Schedule II, which was (and remains) codified at Va. Code § 54.1-3448.1. That schedule listed various substances, from "[r]aw opium" to hydrocodone, morphine to fentanyl. *Id.* One of the categories is listed as follows:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine; cocaine or any salt or isomer thereof.

Va. Code § 54.1-3448.1 (1999); *see also* ECF No. 126-3 (Gov't Hearing Ex. 2).

Neither side contends that Dorsey was charged with or convicted of distributing "[c]oca leaves" or anything else that precedes the semicolon in that definition of a controlled "substance." And, critically, both sides agree that within the last phrase ("cocaine or any salt or isomer thereof") *it matters* whether Dorsey was convicted of distributing "cocaine" or whether he was convicted of distributing a "salt or isomer thereof." That is because, as explained in greater detail below, if one or more jurors could have voted to convict him for distributing "cocaine" based on a finding that the substance he distributed was a "salt or isomer" of "cocaine"—as opposed to "cocaine"— that means he may have been convicted of distributing something other than "a controlled substance (*as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))*," which is how the ACCA defines a state-law "serious drug offense." 18 U.S.C. § 924(e). That, in turn, is because the federal Controlled Substances Act does not define cocaine as "cocaine or ***any*** salt or ***isomer thereof***" as Virginia does, Va. Code § 54.1-3448 (1999) (emphasis added), but rather as "cocaine, its salts, ***optical and***

20

***geometric isomers***, and salts of isomers." 21 U.S.C. § 812, Schedule II(a)(4) (1990) (emphasis added). In other words, whereas in Virginia it was unlawful in 1999 to distribute "any" isomer of "cocaine," under federal law it was unlawful only to distribute "optical and geometric" isomers of "cocaine."

As described above, the parties' expert witnesses have explained what "isomers" are, what categories of isomers of cocaine exist, etc. The Court will explain below why "any . . . isomer" is broader than "optical and geometric isomers." But before reaching that question the Court must first decide divisibility. So: When Virginia in 1999 set out to prove that Dorsey violated § 18.2-248 by distributing cocaine, did Virginia law require a jury to find unanimously (beyond a reasonable doubt) that the substance he distributed was "cocaine" *and not an "isomer thereof"*? In answering that question, the Court must "counterintuitively ignore whether the defendant's actual conduct involved" the distribution of, for example, (R)-cocaine, on one hand, or a "salt or isomer" of (R)-cocaine, on the other hand. *See Allred*, 942 F.3d at 648. Instead "[t]he key . . . is elements, not facts." *Descamps*, 570 U.S. at 261. In other words, to decide divisibility here the Court must determine whether § 54.1-3448 lists cocaine and isomers thereof as alternative elements of the crime, meaning a jury would have to unanimously find one or the other to convict (meaning the statute is divisible on this ground), or whether the statute lists one crime that can be committed by distributing cocaine *or* an isomer thereof such that a jury could be split on which substance was distributed but could still reach a unanimous verdict to convict (meaning the statute is indivisible on this ground). *Mathis*, 579 U.S. at 504–05; *Descamps*, 570 U.S. at 257–58; *Allred*, 942 F.3d at 648.

The government here argues that the statute is divisible between "cocaine" and "isomer[s] thereof" and therefore the modified categorical approach should apply. Its

principal argument is that the Fourth Circuit already decided this question, in *Cucalon*, 958 F.3d at 253. But that argument takes language in *Cucalon* out of context and distorts the actual holding in that case; the operative question here is an open one in this Circuit. The petitioner in *Cucalon*[7] had been convicted of "distribution of cocaine as an accommodation, in violation of Virginia Code § 18.2-248(D), render[ing] him removable as an alien convicted of an 'aggravated felony,' and as an alien convicted of a crime 'relating to a controlled substance.'" *Id*. at 248 (citing 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1227(a)(2)(B)(i)). Before the immigration judge ("IJ") and the Board of Immigration Appeals ("BIA"), and as his primary argument on appeal, the petitioner argued that (1) § 18.2-248(D) is "categorically overbroad" because "Virginia includes on its controlled substance schedules at least one substance not listed on the federal schedules" and (2) the Virginia statute is indivisible as to "the identity of the prohibited substance." *See Cucalon*, 958 F.3d at 251–52; *see also* 18-1292 (4th Cir.), ECF No. 29 at 19-20 (Petitioner's brief).

The Fourth Circuit agreed on the first point. 958 F.3d at 251 ("agree[ing] with the parties that Virginia Code § 18.2-248 is categorically overbroad, because Virginia includes on its controlled substance schedules at least one substance not listed on the federal schedules"). But it disagreed with respect to the second argument, holding that "§ 18.2-248 is divisible by substance." *Id*.

That leads to this next question, which the parties here vigorously dispute: Does the latter constitute a holding that the crime of violating § 18.2-248 by distributing

---

[7] *Cucalon* arose under the Immigration and Nationality Act, not the ACCA, but the divisibility analysis "applies equally" in both contexts. *Omargharib v. Holder*, 775 F.3d 192, 196 n.6 (4th Cir. 2014).

"cocaine or any salt or isomer thereof," Va. Code § 54.1-3448.1 (1999), is divisible as between distribution of "cocaine" and distribution of a "salt or isomer" of cocaine?

It does not. Most fundamentally, the *Cucalon* court itself expressly drew a distinction between that aspect of its analysis (analyzed in Section II of its opinion), on one hand, with the argument—which it held had been waived, and which the petitioner did not dispute had been "waived"—based on "the alleged discrepancy between cocaine isomers covered under the Virginia schedule and the federal schedule." 958 F.3d at 254. Here, the government repeatedly cites section II of the *Cucalon* court's analysis as resolving the question of whether § 54.1-3448 is divisible between "cocaine" and "any salt or isomer thereof." *See, e.g.*, ECF No. 87 at 6. But that makes no sense, among other things because the Fourth Circuit (1) expressly addressed that argument ("the alleged discrepancy between cocaine isomers covered under the Virginia schedule and the federal schedule") in section III of the opinion, and (2) expressly held, as noted above, that it had been waived. The *Cucalon* court took pains to emphasize that its thorough divisibility analysis was *not* about whether § 54.1-3448 was divisible with respect to cocaine vs. isomers of cocaine. If the Fourth Circuit itself considered the basis on which it *did* affirm the BIA's removability ruling to be *different* from that issue—the one at issue here—the government cannot contend that section II of *Cucalon* forecloses the argument that Dorsey has raised here.

The substance of the *Cucalon* court's analysis in Section II of its opinion confirms this analysis. The *Cucalon* court held that under the Virginia Supreme Court's decision in *Cypress v. Commonwealth*, 699 S.E.2d 206 (Va. 2010), "Virginia Code § 18.2-248 requires proof of the identity of the prohibited substance as an element of the offense." 958 F.3d at 252. In *Cypress*, the court held, based on then-recent Supreme Court

23

precedent, that Cypress had the right to be confronted at trial with the analyst who generated a certificate of analysis, describing the composition and amount of the illegal substance at issue (cocaine) and that the applicable state statute did not adequately protect that right. 699 S.E.2d at 212–13. But the *Cypress* court held that while Cypress's confrontation rights were violated, the error was harmless because other evidence also established that the substance at issue was cocaine, which was an element of the crime. *Id.* at 214 ("When the elements of the charged offenses are established beyond a reasonable doubt by admissible evidence, the erroneous admission of evidence probative of the same elements is harmless.").

Thus, when the Fourth Circuit held that the "the identity of the prohibited substance is an element of Virginia Code § 18.2-248 and that the statute is divisible on that basis," *Cucalon*, 958 F.3d at 253, it was referring to *that* distinction—not to whether § 54.1-3448.1's prohibition on "cocaine or any salt or isomer thereof" is itself divisible. The *Cucalon* court explained, "the controlled substances listed on the schedules are not merely 'illustrative examples' of factual means of committing the crime of distribution of a controlled substance"; "[r]ather, the substances listed in the six Virginia schedules constitute the entire universe of controlled substances covered by Virginia Code § 18.2-248," thus "strongly suggest[ing] that the substances are elements of the crime, not merely means of commission." *Id.* at 251. In other words, the *Cucalon* court's conclusion was that a person cannot be convicted of distribution of a controlled substance if, for example, some jurors believed the defendant distributed heroin while others believed the defendant distributed marijuana. Rather, a jury must unanimously conclude, as an element of the offense, which type of substance was distributed: heroin, marijuana, cocaine, etc. *Cypress*, 699 S.E.2d at 213–14.

24

That is not the dispute here. There is no dispute that Dorsey was convicted under the provision in § 54.1-3448.1 that makes unlawful the distribution of "cocaine or any salt or isomer thereof." Here, the question is whether *that provision* is itself divisible. In *Cucalon*, the Fourth Circuit acknowledged that the petitioner had not made *that* argument until a motion for reconsideration before the BIA—arguing for the first time, among other belated arguments, that "the alleged discrepancy between cocaine isomers covered under the Virginia schedule and the federal schedule" was an alternative basis for concluding that § 18.2-248 "is overbroad." 958 F.3d at 254.

For these reasons, Section II of *Cucalon*—the portion of that opinion that addressed the arguments had *not* been waived—did not decide the question presented by Dorsey's § 2255 motion. At argument here, although the government did not concede that point, it offered a fallback argument: that in one sentence in section III of *Cucalon* the Fourth Circuit did foreclose Dorsey's divisibility argument. Specifically, the *Cucalon* court said this: "even if not waived, we agree with the BIA that these arguments and additional evidence would not change our conclusion that Virginia Code § 18.2-248 is divisible by substance and, therefore, is subject to examination under the modified categorical approach." *Id*. That argument gets closer to a faithful reading of *Cucalon*, but that argument fails too, for two reasons.

First, there were four different arguments that petitioner had waived; it is not clear whether in the phrase the government here is relying on the Fourth Circuit was referring to his second one (that "§ 18.2-248 is overbroad" based on "the alleged discrepancy between cocaine isomers covered under the Virginia schedule and the federal schedule") or the fourth one (based on "evidence of Virginia indictments that he alleged supported his argument that Virginia Code § 18.2-248 is not divisible by

25

substance"). If anything it appears more likely the panel was referring to the latter. Either way, that ambiguity—about arguments both of which were held to have been waived—counsels against concluding that the statement was a holding that the panel considered to constitute binding precedent on the complex questions of divisibility and overbreadth with respect to stereoisomers or constitutional isomers of (R)-cocaine.

Second, that was at most a passing comment, the type of "stray comments" the Supreme Court itself has warned counsel and trial courts not to "stretch . . . beyond their context." *Brown v. Davenport*, 596 U.S. 118, 141 (2022).

In short, beyond that passing comment in *Cucalon* about arguments that had been waived, the Fourth Circuit has not held one way or the other whether § 54.1-3448.1 is divisible *within* one of the categories of substances listed on the Virginia schedules that contain multiple forms of the prohibited substance—such as here, "cocaine or any salt or isomer thereof."[8] Instead, this Court must actually apply the Supreme Court's and Fourth Circuit's precedents and analyze whether § 18.2-248's prohibition on distributing a "controlled substance" is divisible or indivisible with respect to "cocaine

---

[8] The government cites *United States v. Wysinger*, 64 F.4th 207, 219 (4th Cir. 2023), for the proposition that the Fourth Circuit has "rejected the argument" that "isomers 'exist in the drug trade.'" ECF No. 87 at 10. But not only was the cited statement made in the context of plain error review, *see Wysinger*, 64 F.4th at 219, but as explained herein (above and below) the parties here do not dispute—and indeed the government's expert affirmatively testified—that isomers of (R)-cocaine exist, and not just theoretically but in the real world. If anything, *Wysinger* is at least arguably more supportive of Dorsey's position than the government's, because in explaining that the *Wysinger* appellant's "argument falls significantly short of establishing plain error" the *Wysinger* court distinguished its case from a Seventh Circuit case involving an Illinois statute that "specifically defined 'cocaine' as including its 'optical, positional and geometric isomers.'" *Id*. at 219 n.6 (citing *United States v. Ruth*, 966 F.3d 642, 647 (7th Cir. 2020)).

or any salt or isomer thereof" in § 54.1-3448.1. Those precedents compel the conclusion that the statute is indivisible with respect to its prohibition on distributing "cocaine or any salt or isomer thereof," for four reasons.

First, the Fourth Circuit has instructed unambiguously that a statute can be divisible in one respect but indivisible in another. In *Hope*, for example, the Fourth Circuit held that although a South Carolina statute was "divisible as to drug conduct"— such as the "distribution, sale, purchase, manufacturing, or possession with intent to distribute"—the statute was indivisible as to drug type. 28 F.4th at 499, 502–503.[9] Thus, the fact that § 54.1-3448.1 is divisible with respect to distinct categories of listed substances, *Cucalon*, 958 F.3d at 254, is a separate question from whether, as applicable here, the statute is divisible between "cocaine" and "any salt or isomer thereof." *See also, e.g.*, *United States v. Keaton*, Case No. 18-cr-0215-TDC, ECF No. 146 at 24–27 (June 1, 2022) (Judge Chuang ruling that although the Maryland controlled substances statute "[was] divisible at the level of the type of drugs, such as heroin versus cocaine, it [did] not follow that the statute [was] further divisible between the various forms of cocaine-related drugs").

Second, the grammar, structure and punctuation of that provision all indicate indivisibility. Consider the Virginia controlled substance schedules as a whole: they

---

[9] The government points out that *Hope* was abrogated by *Brown*, 602 U.S. 101. But *Brown* abrogated only *Hope's* holding that when determining whether a state criminal statute describes an ACCA predicate, courts should compare the language of the relevant statutes as they exist *at the time of sentencing*, which is not a holding on which this Court is relying. *Id.* at 123 ("[W]e hold that a state drug conviction counts as an ACCA predicate if it involved a drug on the federal schedules *at the time of that offense.*") (emphasis added). *Hope* otherwise remains good law.

constitute lists of types of substances separated by semicolons and line breaks. The first three are:

Raw opium;

Opium extracts;

Opium fluid extracts;

Va. Code § 54.1-3448.1 (1999). The category here lists "cocaine or any salt or isomer thereof" together—not separated by semicolons or any line break. And although some substances are identified definitively by name (e.g. "[o]xycodone"), other types of substances are listed more descriptively or categorically, such as "[c]oca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine." *Id*. The more descriptive categories only make sense when read as a whole. The latter portion of the category at issue here ("or any salt or isomer thereof") is meaningless without the first portion ("cocaine").

Third, legislative history. The reason many statutes defining cocaine were amended in the 1970s and 1980s to include cocaine isomers was to combat the so-called "cocaine isomer defense," "which relied on the chemical difference between two particular isomers of cocaine," the naturally occurring isomer and a synthesized isomer. *United States v. Minter*, 80 F.4th 406, 411 (2d Cir. 2023). "Standard laboratory tests did not distinguish between [the two isomers], and defendants could therefore argue that they could not be convicted for cocaine offenses beyond a reasonable doubt absent proof that the substance at issue in their case was in fact" natural cocaine. *Id*. at 411–12; *see United States v. Scott*, 725 F.2d 43, 45 (4th Cir. 1984) (discussing the cocaine isomer

28

defense in the context of 28 U.S.C. § 801 and holding that "this Court is 'no stranger' to the 'cocaine isomer' theory" and that "we, like other courts, have been unwilling to accept the basic premise of the theory that only cocaine derived from coca leaves . . . is within the statutory prohibition"); *United States v. Puglisi*, 790 F.2d 240, 242 n.1 (2d Cir. 1986) (explaining that Schedule II of 21 U.S.C. § 812 was amended to add isomers to the definition of cocaine and to define isomer as "the optical or geometric isomer" in order "to "render the 'isomer defense' ineffective"). Virginia amended its Schedule II definition in 1979. 1979 Va. Acts ch. 387. This context confirms that legislatures, like Virginia's when it expanded what forms of "cocaine" are unlawful, were not attempting to create separate crimes regarding natural cocaine and synthetic isomers (rendering the statutes divisible), but were attempting to include additional theoretically possible variations of the cocaine molecule into the *same* crime, indicating that definitions of cocaine that list cocaine, its salts, and its isomers were meant to be indivisible.

Fourth, Virginia cases interpreting § 18.2-248 and the incorporated schedules confirm that the schedules are indivisible within any given category of substance. In *Lewis v. Virginia*, for example, the court explained that "[a]n indictment charging the possession with intent to distribute 'Methamphetamine, a Schedule II substance,' . . . necessarily refers to and incorporates the definition of the 'substance' as set out in Schedule II." 879 S.E.2d 918, 924 (Va. App. 2022). The Virginia schedule's definition of methamphetamine is "[a]ny substance which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers." *Id*. (quoting Va. Code § 54.1-3448.3). Thus a person indicted for distributing "methamphetamine" could be convicted if they distributed any substance "contain[ing] any quantity of methamphetamine, including its salts, isomers, and salts of isomers." By that reasoning,

29

a person indicted for distributing "cocaine" could be convicted if they distributed "cocaine or any salt or isomer thereof." In other words, under Virginia law distributing an "isomer" of cocaine is a means of distributing "cocaine"—not a separately defined crime.

For these reasons, although § 54.1-3448 is divisible with respect to categories of substances as defined in the statute, *Cucalon*, 958 F.3d at 253, it is indivisible *within* a given category of substance defined in the statute. The Court, therefore, must apply the categorical approach to determine whether the crime of the conviction at issue covers broader conduct than the corresponding federal crime. Specifically, the Court must compare the substances that Virginia criminalized the distribution of in 1999 with the substances that the federal government criminalized the distribution of in 1999.

### 3. *Applying the categorical approach*

Under the categorical approach, the next step is to determine whether "the State's definition of the drug in question 'matche[s]' the definition under federal law." *Brown*, 602 U.S. at 106 (citing *Shular v. United States*, 589 U.S. 154, 158 (2020)).

In 1999, federal law defined cocaine, in part, as "cocaine, its salts, optical and geometric isomers, and salts of isomers." 21 U.S.C. § 812(c), Schedule II(a)(4) (1990). Side-by-side and in full, the difference between Virginia's definition and the federal definition are apparent:

| Va. Code § 54.1-3448.1 (1999), Schedule II (emphasis added) | 21 U.S.C. § 812, Schedule II(a)(4) (1990) (emphasis added) |
|---|---|
| cocaine or **any** salt or **isomer** thereof. | cocaine, its salts, **optical and geometric isomers**, and salts of isomers; |

Virginia prohibited *any isomer* of cocaine; the federal government prohibited optical and geometric isomers of cocaine. Without any knowledge of organic chemistry, one can assume that—unless optical and geometric isomers are the *only* types of isomers—the state definition of cocaine is broader than the federal. With a superficial knowledge of organic chemistry, the textual analysis does not change. As the government's expert, Dr. Denmark, explained, "study of the three-dimensional behavior of molecules is called stereochemistry." ECF No. 101-1 at 2. "Isomers" are "chemical compounds composed of the same elements in the same ratios." *Id.* "For example, $C_6H_{12}O_6$ is the molecular formula for glucose, but it is also the molecular formula for many other sugars, such as fructose." *Id.* "Despite having the same chemical composition, isomers vary widely in their chemical, physical and biological properties because of differences in their chemical structure, that is, the specific ways the atoms of each element are connected as well as their spatial orientation and their behavior upon reflection in a mirror." *Id.*

As Dr. Denmark explained and as described above, as a general matter there are three categories of isomers: (1) "enantomeric (optical isomers)," (2) "diastereomeric (geometrical isomers)" and (3) "constitutionally isomeric (positional isomers)." *Id.* at 3 & 8. The first two (enantomeric and diastereomeric) are considered "stereoisomers"—so another way to categorize isomers is between (1) stereoisomers, *i.e.* enantomeric and diastereomeric isomers, and (2) constitutional isomers. *Id.* at 5. The terminology in parentheses appears in some statutes and older scientific treatises but, as Dr. Denmark explained, "[i]n more modern times" those terms "have been abandoned as being imprecise." *Id.* at 8. Today, most experts on stereochemistry use terms including enantomeric and diastereomeric (as opposed to optical and geometric), and

constitutional (as opposed to positional). *Id.* In 1999, though, diastereomers appear to have been synonymous with geometric isomers. *See id.* at 7–9 (citing sources from 1994 and 1996 that equate diastereomers with geometric isomers).

Wholly separate from optical and geometric isomers, the two types of stereoisomers, are constitutional isomers. *See* ECF No. 93-1 at 2–3. While stereoisomers differ in spatial arrangement from the principal molecule, constitutional isomers differ in structure. *See id.*; ECF No. 101-1 at 5. Because of their structural differences, constitutional isomers often have different physical and chemical properties. *See* ECF No. 101-1 at 5 ("[C]onstitutional isomers are the most unlike [other types of isomers] because their only similarity is the same molecular formula, all other structural attributes can be different.").

As the government's expert explained, in 1999 cocaine was understood to have (at least) optical isomers, geometric isomers, and constitutional isomers. *Id.* at 9 (Dr. Denmark reporting that in a chemistry treatise, revised in 1994, "all stereoisomers of cocaine [could] be classified as either mirror image (optical) isomers or cis–trans (geometrical) isomers"); *id* at 7 (opining that Va. Code § 54.1-3448 "could be interpreted as covering all isomers of cocaine, including . . . constitutional isomers," but concluding that to do so would be "absurd"). And, critically, there is no dispute that constitutional isomers are not merely theoretical, but exist in various forms. For example, as Dr. Denmark explained during the June 4, 2026 hearing, one constitutional isomer of (R)-cocaine is scopolamine, which as noted above Dr. Denmark explained has everyday medical uses. Indeed, "[c]onstitutional isomers 'were known to exist'" in the 1970s, including in 1978 "when the New York Legislature added the term "isomers" to the definition of cocaine.'" *Minter*, 80 F.4th at 412 (quoting *United States v. Holmes*, Case

No. 21-cr-147, 2022 WL 1036631, at *8 (E.D.N.Y. Apr. 6, 2022)). Thus, when Virginia prohibited the distribution of cocaine and "any . . . isomer thereof," Virginia prohibited constitutional isomers, a molecule chemically distinct from the federal prohibition of cocaine's "optical and geometric isomers."

For these reasons, as a matter of plain text, and context—and confirmed by the scientific meaning of the terms contained in the federal and Virginia definitions of "cocaine"—the Virginia prohibition on distribution of cocaine in 1999 was "unambiguously broader than its federal counterpart." *See United States v. Myers*, 56 F.4th 595, 598–99 (8th Cir. 2022) (reaching that conclusion with respect to a Missouri definition that, like Virginia's, defined cocaine to include, as the court put it, "all isomers of cocaine").

The Fourth Circuit's decision in *Hope*, although not squarely on point, confirms that this is the correct mode of analysis. The *Hope* court did not simply ask whether marijuana, the drug in question, was prohibited by the state and federal governments. *See Hope*, 28 F.4th at 504. On the face of the statutes, it was: Both state and federal statutes named "marijuana" as a prohibited substance. *See id.* at 505–06. But the word "marijuana" in each statute did not count as a categorical match. What mattered was how each government *defined* marijuana. *See id.* And the state defined it more broadly than the federal government did. *Id.* The state criminalized "hemp"; the federal code did not. *Id.* There was "no categorical match." *Id.* "Accordingly, [the defendant's] prior state convictions d[id] not meet the definition of 'a serious drug offense,' and, therefore, should not have triggered the ACCA minimum sentence enhancement." *Id.* at 506–07. Applied here, *Hope* shows that this Court cannot simply compare the word "cocaine" on the Virginia drug schedule with the word on the federal schedule. While "cocaine"

33

appears on both, what matters under ACCA analysis is how each schedule defines "cocaine." And here, Virginia defined "cocaine" more broadly than the corresponding federal schedule did. Thus, the Commonwealth criminalized more conduct (i.e., more substances) than the federal government did in 1999. "[T]here is no categorical match." *See id.* at 506. Under the reasoning in *Hope*, Dorsey's conviction for distribution of cocaine is not an ACCA predicate.

Other circuits, and another judge of this Court, have followed similar reasoning, specifically in considering arguments materially indistinguishable from Dorsey's. In *Minter*, the Second Circuit, confronting a similar ACCA challenge, held that "the plain text" of "New York's definition of cocaine [wa]s categorically broader than the federal definition," meaning a conviction for "the sale of cocaine" did not qualify as an ACCA predicate. *See* 80 F.4th at 407–08, 411. The New York statute's breadth came from its inclusion of all isomers of cocaine. *Id.* at 410–11. Unlike the New York statute, the federal statute prohibited only optical and geometric isomers of cocaine, and thus did not prohibit constitutional isomers. *Id.* at 410. The *Minter* court noted that "[i]f a state statute of conviction is broader than its federal counterpart—that is, if the state statute criminalizes conduct that is not criminalized under the analogous federal law—the state conviction cannot be used to enhance a defendant's sentence under the ACCA." *Id.* at 409. Thus, the Second Circuit held that a New York conviction for the sale of cocaine did not qualify as a serious drug offense under the ACCA. *Id.* at 407.

Likewise, as noted above, the Eighth Circuit in *Myers* looked at the defendant's "conviction involv[ing] cocaine" and "compare[d] the definition of cocaine under Missouri law . . . with the definition of cocaine under federal law." 56 F.4th at 598 (footnotes omitted). Again, the state definition of cocaine was broader than the federal

definition: "Because Missouri's definition of cocaine included positional isomers [i.e., constitutional isomers] while the federal definition does not, the Missouri definition is unambiguously broader than its federal counterpart." *Id.* The *Myers* Court concluded that "[g]iven the unambiguous breadth of Missouri's definition of cocaine, . . . [the defendant's] prior Missouri conviction for the sale of cocaine was not a predicate offense for purposes of the ACCA." *Id.* at 599.

Similarly, in *United States v. Ferguson*, the Eight Circuit held that the Arkansas criminal statute at issue was broader than the federal analog because the state statute criminalized all cocaine isomers, not just optical and geometric isomers. 163 F.4th 541, 544 (8th Cir. 2026). The *Ferguson* court rejected the government's argument that the state statute was "divisible with respect to cocaine and its isomers and that [it] should therefore apply a 'modified' categorical approach," concluding that "delivering a particular isomer of cocaine is merely a means of delivering cocaine" rather than an element, which would demand the use of the modified categorical approach. *Id.* at 545. Then, utilizing the categorical approach, the court concluded that the state statute "criminalizes a wider range of cocaine isomers than" the federal statute, and the defendant's state conviction was therefore not "a 'serious drug offense' and did not qualify as a predicate offense for the ACCA enhancement." *Id.* at 546.

And in *Keaton*, No. 18-cr-0215, a case from this district, Judge Chuang had to decide whether a "1995 Maryland conviction for possession with intent to distribute cocaine categorically fail[ed] to qualify as a serious drug offense because the definition of cocaine under that statute [was] broader than the definition under the federal Controlled Substances Act." 18-cr-0215, ECF No. 146 at 24. Judge Chuang ruled from the bench, addressing the "complicated set of arguments." *Id.* Even though the

35

Maryland "statute [was] divisible at the level of the type of drugs, such as heroin versus cocaine, it [did] not follow that the statute [was] further divisible between the various forms of cocaine-related drugs." *Id.* at 28. Thus, following *Hope*, Judge Chuang compared the Maryland statute defining cocaine to the corresponding federal statute and held that Maryland's "definition of cocaine [was] broader than the federal definition." *Id.* at 25–27. A conviction under the Maryland statute, therefore, "did not qualify as a felony drug offense for purposes of an enhancement." *Id.*

Because Virginia's statute criminalizing the distribution of cocaine, while divisible by general drug type, is not further divisible by the sub-types of cocaine, this Court, applying the categorical approach, concludes that the Virginia statute criminalizes more sub-types of cocaine than the federal statute did at the time of Dorsey's prior offense. Thus, the two statutes are not a categorical match and Dorsey's Virginia distribution of cocaine conviction is not an ACCA predicate offense. Because Dorsey no longer has three ACCA predicates, under *Johnson*, 576 U.S. 591, and *Brown*, 602 U.S. at 101, he is not an armed career criminal under the ACCA and his sentence should be reduced.

### 4. *The Realistic Probability Test Is Inapplicable Here*

The government argues that even if the state and federal statues are not a categorical match, there is no "realistic probability" that in 1999 "the state of Virginia was "prosecuting the distribution of constitutional isomers of cocaine, as opposed to common cocaine." ECF No. 87 at 9–10 (citing *United States v. Battle*, 927 F.3d 160, 164 (4th Cir. 2019)). In *Battle*, the Fourth Circuit held that in applying the categorical approach in determining whether a state crime is an ACCA predicate, "the conduct must give rise to a 'realistic probability, not a theoretical probability' that a state would apply

36

the law and uphold a conviction based on such conduct" and that a defendant "must 'demonstrate that the State actually prosecutes the relevant offense in cases' in the manner [the defendant] claims." 927 F.3d at 164 (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 191, 206 (2013)).

But in *United States v. Taylor*, 596 U.S. 845 (2022), three years after *Battle*, the Supreme Court concluded that when analyzing predicate offenses via the categorical approach, a defendant need *not* "present evidence about how his crime of conviction is normally committed or usually prosecuted" and, instead, courts should consider "only whether the elements of one [ ] law align with those prescribed in another." *Id.* at 858–59. As the Fourth Circuit has explained in a post-*Taylor* (and thus post-*Battle*) case, *Taylor* prohibits courts applying the categorical approach from "inquir[ing] as to how the crime is normally committed"; instead, "[t]he categorical approach was thus rendered an *interpretive* one focused on the meaning of the crime's elements, not an *empirical* one based on evidence of how and when the government prosecutes the crime." *United States v. Robinson*, 92 F.4th 531, 535–36 (4th Cir. 2024).

The government asks this Court to reach a conclusion essentially rejected by *Taylor*: to go beyond the plain words of the statutes at issue and consider how Virginia was likely to have applied the statute. It is for this reason that Mr. Payne's testimony at the hearing, that he has never seen a prosecution for a cocaine isomer other than (R)-cocaine, is legally irrelevant to this Court's analysis. Indeed, the Fourth Circuit previously concluded in determining whether a state conviction was equivalent to a federal offense for purposes of removal under the Immigration and Nationality Act that the "realistic probability" test did not apply when "the language of a statute unambiguously is broader than the federal offense under comparison." *Gordon v. Barr*,

965 F.3d 252, 261 (4th Cir. 2020); *see also Minter*, 80 F.4th at 413 ("[T]he realistic probability test applies only 'as a backstop when a [state] statute has indeterminate reach.' It has no place where, as here, the statute's scope is plain.") (quoting *Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018)); *Myers*, 56 F.4th at 599 (holding that "[t]he government also raises arguments about the non-existence of positional isomers in the drug trade, such that Missouri would have no reason to criminalize them . . . . But absent ambiguity, we are 'bound to give effect to the intent reflected in the statute's plain language and cannot resort to other means of interpretation,'" and that "[b]ecause the text of the Missouri drug schedule plainly criminalized all isomers of cocaine, our inquiry ends there") (quoting *Karney v. Dep't of Lab. & Indus. Rels.*, 599 S.W.3d 157, 162 (Mo. 2020)).

Here, the Virginia statute unambiguously and on its face criminalizes the distribution of more types of cocaine isomers than the federal statute does. To the extent the "realistic probability" retains any vitality after *Taylor*, it has no application here.

**D. Time served vs. 10-year sentence**

Having determined that Dorsey does not have three ACCA predicate convictions, and therefore he should not have received an ACCA sentence enhancement, the Court must determine the precise relief to which he is entitled. Dorsey has already served the equivalent of a 253-month sentence. *See* ECF No. 107 at 2 n.1. Dorsey argues that he should be resentenced to an express term of ten years, which was the maximum sentence for his crime without the ACCA enhancement. The government suggests a sentence of time served. This dispute arises because, in addition to the instant offense, in 2017 he was convicted in the Western District of Oklahoma for possessing contraband in prison, for which that court imposed a 27-month sentence and ordered that it be

38

served consecutive to his sentence in this case. Case No. 5:17-cr-00103, ECF No. 22 at 2 (W.D. Ok. Dec. 4, 2017). Dorsey is concerned that (1) if this Court amends the sentence in this case to "time served" the Bureau of Prisons may deem Dorsey to not have yet (as of the date of the amended judgment that is being filed together with this opinion) begun serving his 2017 sentence, and (2) because Dorsey has already served more than the statutory maximum in the current case (10 years) plus the 27 months in the Oklahoma case he should be released immediately. The government argues that even if this Court rules that 10 years was, in retrospect, the statutory maximum on this case, Dorsey should still serve another 27 months to effectuate the Oklahoma district judge's order that that sentence be served consecutively.

It is the Court's understanding, however, that either sentence—10 years or time served—will result in Dorsey's immediate release, which is the Court's intention. Pursuant to 18 U.S.C. § 3584(c), "[m]ultiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment." *See also* Bureau Program Statement 5880.28, Sentence Computation Manual (CCA of 1984). Thus, Dorsey's time-served sentence and his consecutive 27-month sentence are viewed by BOP as a single aggregate sentence. The Court's understanding is that once BOP factors in Dorsey's sentence-reducing credits for the aggregate sentence, his 27-month consecutive sentence will have been effectively served and he will be immediately released. Therefore, the Court will sentence Dorsey to time served, with the understanding that such a sentence will not require him to serve an additional 27-months and that he will be immediately released.

### III. CONCLUSION

The Court has subject matter jurisdiction over Dorsey's § 2255 petition. The parties agree that two of Dorsey's prior convictions are no longer violent felonies under ACCA. Moreover, the Court concludes that Dorsey's prior conviction for cocaine distribution is also no longer an ACCA predicate because the Virginia statute under which he was convicted criminalized more forms of "cocaine" than the analogous federal statute did at the time of the offense, and therefore was broader than the federal statute. Thus, Dorsey no longer has three predicate offenses under ACCA and he is not an armed career criminal requiring enhanced sentencing. As a result, the Court will grant Dorsey's petition and will reduce his sentence to time served and five years of supervised release.

Dorsey's motion for compassionate release will be denied as moot.


July 17, 2026

/s/
_____
Adam B. Abelson
United States District Judge

40